**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NAPOLEON SANDEFORD,

        Plaintiff,

  v.

CHARLES PLUMMER, et al.,

        Defendants.

_____/

No. C 06-06794 SBA (PR)

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

(Docket no. 57)

## INTRODUCTION

Plaintiff Napoleon Sandeford, a federal prisoner currently incarcerated at the Federal Correctional Institution in Dublin, California, filed this pro se civil rights action under 42 U.S.C. § 1983 against Defendants, alleging constitutional violations that occurred while he was housed at the Glenn E. Dyer Detention Facility (GDDF) in Oakland, California from April 25, 2005 to February 2, 2006. Plaintiff seeks declaratory relief and monetary damages from Defendants. Defendants move for summary judgment. Plaintiff has not filed an opposition to Defendants' motion for summary judgment.[1]

For the reasons discussed below, Defendants' motion for summary judgment is GRANTED.

## PROCEDURAL BACKGROUND

On October 23, 2006, Plaintiff filed this action against the Alameda County Sheriff's Office (ACSO), the United States Marshals Service, Officer Hal Morrison, Sergeant S. Wolf, Sheriff

---

[1] The Court notes that Plaintiff has received a total of five extensions of time to file his opposition, which was originally due no later than January 18, 2010, forty-five days after Defendants filed their motion. On December 17, 2009, the Court, on its own motion, granted an extension of time for Plaintiff to file opposition to February 1, 2010. On January 14, 2010, Plaintiff was then granted another extension until February 15, 2010 to file his opposition. When Plaintiff first informed the Court that he had been transferred to Dublin without his "legal work," the Court issued an Order dated February 16, 2010 granting Plaintiff yet another extension, giving him until March 1, 2010 to file his opposition. The February 16, 2010 Order was returned as undeliverable. Thus, the Court granted Plaintiff another extension, and the new deadline to file an opposition became March 15, 2010. On March 17, 2010, Plaintiff filed another request for extension of time, which the Court granted, giving him up to and until March 22, 2010 to file his opposition. Therefore, on top of the forty-five days Plaintiff originally had to file his opposition, he has received sixty-four additional days to do so. To date, the Court has not received Plaintiff's opposition.

United States District Court
For the Northern District of California

Charles Plummer, and the Doe Defendants.[2]  Plaintiff, a practicing Muslim, alleged in the original

complaint that the jail staff, who he named as "Defendant ACSO," violated his rights to free exercise

of religion and equal protection by failing to grant his requests (1) for an "Islamic Diet," (2) for

access to Islamic religious services, and (3) for permission to wear a Kufi cap (i.e., a Muslim prayer

cap).  (Second Compl., Supporting Facts at 2-3.)  Plaintiff also alleged that Defendant ACSO failed

to deliver meals prior to sunrise in accordance with Ramadan custom and also denied him the special

meal for Eid. (Id. at 4-5.)  Eid is a Muslim holiday that marks the end of the fasting period of

Ramadan, and that includes a special meal as well as the sharing of gifts.  Finally, Plaintiff claimed

that Defendant ACSO issued a memorandum stating that Ramadan ended before it was officially

over, which caused him not to receive his meals on November 3, 2005 and November 4, 2005.  (Id.)

Plaintiff alleged that Defendant Morrison denied him "an important due process right in the

disciplinary process" stemming from a December 31, 2005 incident where he was sanctioned with a

thirty-day loss of privileges without a disciplinary hearing.  (First Compl., Supporting Facts at 5.)  In

this claim, Plaintiff alleged supervisory liability against Defendant Wolf for subsequent actions

stemming from Defendant Morrison's incident report.  Plaintiff also alleged that Defendant

Plummer, in his supervisory capacity, "fail[ed] to direct or to instruct his staff and subordinates in

proper procedures regarding due process fifth amend[ment] violations" and "fail[ed] to direct or to

instruct his staff and subordinates concerning religious practices."  (First Compl. at 3; Second

Compl. at 3.)

In an Order dated December 18, 2007, the Court found that Plaintiff stated cognizable claims

of First Amendment religious freedom and Fourteenth Amendment equal protection violations

against Defendant ACSO.  (Dec. 18, 2007 Order at 7-8.)  However, the Court directed Plaintiff to

name individual members from the jail staff and explain what each defendant did that caused a

---

[2]  Plaintiff initiated this action by filing two civil rights complaint forms.  The first complaint form names the following Defendants: the ACSO, the United States Marshal's Office, Officer Morrison, Sergeant Wolf, Sheriff Plummer, and the Doe Defendants.  In the second complaint form, Plaintiff names the same Defendants as those in the first complaint form, but excludes Officer Morrison and Sergeant Wolf.  The Court will refer to each complaint as either the "First Complaint" or the "Second Complaint."

United States District Court
For the Northern District of California

violation of his constitutional rights.  (<u>Id.</u> at 8.)  Additionally, the Court determined that Plaintiff

presented a cognizable claim for the denial of due process against Defendant Morrison and served

him with a summons and complaint.  (<u>Id.</u> 10-11.)  The Court dismissed with leave to amend

Plaintiff's claim of supervisory liability against Defendants Wolf and Plummer for failure to state

facts establishing their personal involvement in the alleged constitutional violation.  (<u>Id.</u> at 8-9.)

Further, the Court found that Plaintiff failed to state a cognizable claim under <u>Bivens v. Six</u>

<u>Unknown Named Agents</u>, 403 U.S. 388 (1971), against the United States Marshall's Office, and

dismissed that claim.  (Dec. 18, 2007 Order at 3-4.)  Finally, the Court also dismissed without

prejudice all claims against the Doe Defendants and directed Plaintiff to file an amendment to the

complaint to add them as named Defendants once he learned their identities.  (<u>Id.</u> at 8.)

On January 25, 2008, Plaintiff filed an amendment to the complaint.[3]  Plaintiff amended his

supervisory liability claim by linking Defendant Plummer to his religious freedom and equal

protection claims.  (Am. to Compl. at 1, 5.)  However, Plaintiff did not allege further facts regarding

his claim of supervisory liability against Defendant Wolf.  Additionally, Plaintiff did not name

individual members from the jail staff.

On August 5, 2008, Defendant Morrison filed a motion for summary judgment.

In an Order dated February 25, 2009, the Court granted summary judgment as to all claims

against Defendant Morrison.

In an Order dated August 31, 2009, the Court reviewed the amendment to the complaint and

found that Plaintiff's allegations stated cognizable claims of First Amendment religious freedom and

Fourteenth Amendment equal protection violations against Defendants ACSO (municipal defendant)

and Plummer (supervisory defendant).  (Aug. 31, 2009 Order at 2-7.)  The Court dismissed all

claims against Defendant Wolf without further leave to amend, upon concluding that Plaintiff failed

---

[3]  In the amendment to the complaint, Plaintiff also named L.T.C. Kennedy as a newly-named Defendant for his part in denying a grievance involving Defendant Morrison.  (Am. to Compl. at 3.)  Plaintiff also included claims against other newly-named Defendants -- Ditzenberger, Beachamp, and McCarthy -- for a denial of due process stemming from a hearing based on a July 11, 2005 write up.  The Court dismissed all claims against each newly-named Defendant.  (Aug. 31, 2009 Order at 2.)

1  to allege facts establishing a basis for supervisory liability.  (<u>Id.</u> at 7-8.)  All other claims in his

2  amendment to the complaint were not considered by the Court based on various reasons, including

3  Plaintiff's failure to state a cognizable claim or the Court's determination that Plaintiff needed to

4  raise such claims in a new civil rights action.

5       Before the Court is a motion for summary judgment filed by Defendants ACSO and

6  Plummer.  Defendants move for summary judgment on the grounds that evidence does not exist to

7  support Plaintiff's claims against Defendant ACSO in its municipal capacity, or against Defendant

8  Plummer in his supervisory capacity.  Even if Plaintiff presented evidence to support his claims that

9  Defendants ACSO and Plummer were liable as municipal and supervisory defendants, respectively,

10  Defendants further argue that their actions did not cause a violation of Plaintiff's right to religious

11  freedom or equal protection of the laws.

12       As mentioned above, Plaintiff has not filed an opposition to Defendants' motion for summary

13  judgment.  However, Plaintiff's verified First and Second Complaints as well as his amendment to

14  the complaint function as affidavits in support of his claims and may be considered as evidence in

15  evaluating the merits of Defendants' motion for summary judgment.  <u>See</u> <u>Schroeder v. McDonald</u>, 55

16  F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing

17  affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated

18  under penalty of perjury that contents were true and correct, and allegations were not based purely

19  on his belief but on his personal knowledge); <u>see</u> <u>also</u> <u>Keenan v. Hall</u>, 83 F.3d 1083, 1090 n.1 (9th

20  Cir. 1996), <u>amended</u>, 135 F.3d 1318 (9th Cir. 1998) (treating allegations in prisoner's verified

21  amended complaint as opposing affidavit); <u>Rodriguez v. Airborne Express</u>, 265 F.3d 890, 902 (9th

22  Cir. 2001) (an affidavit is "cognizable to establish a genuine issue of material fact so long as [it]

23  state[s] facts based on personal knowledge and [is] not too conclusory").

## **FACTUAL BACKGROUND**

25       The following factual background is based on the allegations in Plaintiff's complaint and

26  amendment to the complaint, as well as the attached declarations and exhibits in support of

27  Defendants' motion for summary judgment.  The facts are undisputed, unless otherwise noted.

28  **I.    <u>Denial of "Islamic Diet"</u>**

4

1    Plaintiff alleges that he "contacted the medical staff at 'Glendyer' North County jail Alameda

2    County Sheriff's Department and spoke to those in charge of the 'diet meals.'" (Am. to Compl. at 1.)

3    He claims that the "doctor in charge placed [him] on a[n] 'Islamic diet' because the particular status

4    of [his] faith, which is a Sunni Muslim." (Id.)

5    On April 25, 2005, Plaintiff filed a grievance after being told that the jail "no longer ha[d]

6    [Islamic] diet." (Ayala Decl., Ex. 7.)  The Inmate Grievance Response dated May 14, 2005 states

7    that his grievance was denied because the jail's food provider, Aramark Corporation, did not serve a

8    dietary alternative referred to as an "Islamic Diet." (Id., Ex. 8.)  It states that Aramark provides an

9    Ovo-Lacto Vegetarian alternative, which jail staff provides to inmates with religious dietary

10   restrictions. (Id.)  It further states that this Ovo-Lacto Vegetarian alternative meets the guidelines

11   for Kosher and Halal meals, as well as those for inmates' dietary needs. (Id., Ex. 6.)

12   Chaplain Jennings has served as the Chaplain at GDDF since 2007. (Jennings Decl. ¶ 1.)

13   Chaplain Jennings "facilitate[s] religious services for inmates at [GDDF]" including "offering

14   weekly non-denominational religious services, consulting with inmates about their particular beliefs,

15   and overseeing distribution of and inmates' access to, religious literature and other materials." (Id.)

16   As part of his responsibility, Chaplain Jennings ensures that the inmates' diets meet their religious

17   requirements. (Id. ¶ 3.)  According to Chaplain Jennings, "ACSO makes Ovo-Lacto Vegetarian

18   meals available to meet all Muslim dietary needs" and there "is no dietary alternative referred to as

19   an 'Islamic Diet.'" (Id. ¶ 5.)

20   On May 13, 2005, Plaintiff filed another grievance after being served a "'veggie diet' no

21   meat" dinner tray which he claimed to be an incorrect diet tray. (Ayala Decl., Ex. 9.)  The Inmate

22   Grievance Response dated May 15, 2005 states that his grievance was denied because he was given

23   the correct "Lactose Intolerant tray" to "accommodate [his] religious diet requirements." (Id., Ex.

24   10.)  The response also notes that Plaintiff "claim[s] to be Muslim and cannot eat pork" and that

25   "Aramark tries to accommodate [Plaintiff's] request for a Muslim diet by giving [him] a Lactose

26   Intolerant tray." (Id.)  Plaintiff was further informed that "Aramark has several different meal trays

27   for the various inmates who have medical issues and specific diet requirements" but that "[i]t would

28   be impossible for Aramark to accommodate every inmate with the specific meal tray they desired."

1  (Id.)  Because the jail determined that the "diet restrictions [were] self-imposed" by Plaintiff, he was

2  recommended to "either accept the current meal tray, Lactose Intolerant, or accept a regular tray and

3  avoid eating of the pork products."  (Id.)

4  **II.    Interference with Plaintiff's Observance of Ramadan**

5          According to Chaplain Jennings, the Islamic holy month of Ramadan is based on the lunar

6  calendar and falls on different days of the solar calendar each year.  (Jennings Decl. ¶ 10.)  In

7  anticipation of Ramadan, jail staff researches the dates upon which the observance falls for Oakland,

8  California.  (Id.)  In 2005, the Ramadan Time Table for 2005 was adopted as a guide for fasting and

9  prayer times.  (Ayala Decl., Ex. 19.)

10          **A.    Receiving Meals After "Stop Eating" Times**

11          Weeks before Ramadan, jail staff posts sign-up sheets throughout GDDF for inmates to

12  indicate whether they are interested in participating.  (Jennings Decl. ¶ 10.)  According to Chaplain

13  Jennings, one aspect of participating in Ramadan is abstaining from eating food from sunrise to

14  sunset.  (Id. ¶ 11.)  The jail's policy is to deliver breakfast to the participating inmates before sunrise

15  and to deliver dinner after sunset.  (Id.)  Inmates participating in Ramadan are fed before the "Stop

16  Eating" times listed in the Ramadan Time Table for 2005.  (Ayala Decl., Ex. 19.)

17          On July 10, 2005, Plaintiff requested to participate in the fasting during the month of

18  Ramadan.  (Am. to Compl. at 2.)  On at least three occasions, Plaintiff was served breakfast after the

19  "Stop Eating" times listed in the Ramadan Time Table for 2005.  On October 21, 2005, the "Stop

20  Eating" time was 6:00 a.m., but Plaintiff was served breakfast at 6:10 a.m. (Ayala Decl., Ex. 16.)

21  On October 31, 2005, the "Stop Eating" time was 5:11 a.m., but Plaintiff was served breakfast at

22  5:30 a.m. (Id., Ex. 18.)  On November 2, 2005, the "Stop Eating" time was 5:13 a.m., but Plaintiff

23  was served breakfast at 5:40 a.m.  (Second Compl., Ex. 1.)

24          The Ramadan Time Table for 2005 also lists the times for sunrise during the month of

25  Ramadan.  The posted times for sunrise on the three occasions Plaintiff received his breakfast after

26  the "Stop Eating" time are as follows: 7:22 a.m. on October 21, 2005; 6:32 a.m. on October 31,

27  2005; and 6:34 a.m. on November 2, 2005.  (Ayala Decl., Ex. 19.)  On all three occasions, Plaintiff

28

1   was served breakfast before actual sunrise.

2   **B.   Concluding Ramadan Prematurely**

3   Plaintiff alleges that on November 3, 2005 and November 4, 2005, he did not receive his

4   morning meal in observance of Ramadan.  He was "informed that Ramadan was officially over and

5   that it had ended on November 2, [20]05, according to a newly issued memorandum issued by one

6   Sergeant Ary. . . ."  (Second Compl. Supporting Facts at 4.)  The memorandum stated that "Ramadan

7   will begin on Tuesday, October 4, 2005 and concludes on Wednesday, November 2nd."  (Ayala

8   Decl., Ex. 20.)  However, the Ramadan Time Table for 2005, estimated that Ramadan concluded on

9   November 4, 2005.  (Id., Ex. 19.)  The estimated time for Ramadan in Sergeant Ary's memorandum

10  was based on a lunar cycle while the time-line in the Ramadan Time Table for 2005 spans thirty-one

11  days, a longer duration than a lunar month upon which the month of Ramadan is based.  (Ayala

12  Decl., Ex. 19.)

13  **C.   Denial of Special Meal for Eid**

14  On November 6, 2005, Plaintiff requested a special meal to celebrate Eid at the end of

15  Ramadan.  (Second Compl. Supporting Facts at 5.)  Defendants denied Plaintiff's request and

16  informed him that such a celebration could be accomplished by prayer alone, and that a special meal

17  or the sharing of gifts were not necessary.  (Id., Ex. 1.)  Plaintiff was further informed that

18  "[b]ecause of security and facility restraints, [jail] staff has never made special arrangements for the

19  provisions of a special meal or allowing the exchange of gifts between inmates."  (Id.)

20  **III.   Failure to Provide Imam**

21  Plaintiff states that he "requested counseling by a spiritual leader or chaplain, which was not

22  available, because the Alameda [County] Sheriff['s] department has failed to contact religious

23  leaders to participate in Islamic services, for the Muslims weekly Friday Islamic Service."  (Am. to

24  Compl. at 5.)  On April 25, 2005, Plaintiff filed a grievance claiming that there were "no Muslim

25  services" at GDDF.  (Ayala Decl., Ex. 7.)  Additionally, on July 10, 2005, Plaintiff filed another

26  grievance requesting "to work with somebody [at GDDF] to create some form of Islamic services."

27  (Id.)  In response to Plaintiff's grievances, Defendants repeatedly informed him that it had been

28  unable to locate a qualified Imam who is willing and able to provide services at GDDF.  (Id., Exs. 8,

United States District Court
For the Northern District of California

14.)  The Inmate Grievance Response dated July 15, 2005, states that there was a problem with securing an Imam to come to the jail because it was "a general consensus by Imams that when a Muslim commits a crime or goes to jail he/she is considered an outcast from the church until they have repented their sins or crime."  (Id., Ex. 14.)

## IV.   **Denial of Kufi cap**

On July 10, 2005, Plaintiff requested certain items to perform religious rituals, including a prayer rug, beads, oils, a Quran and headgear.  (Id., Ex. 12.)  Plaintiff was told that upon request, the jail provides a clean towel to Muslims as a substitute for a prayer rug.  (Id., Ex. 14.)  Plaintiff was also provided a Quran and other Islamic prayer material.  (Id.)  However, due to security concerns, Defendants denied Plaintiff's request for beads, oils and headgear.  (Id.)  Plaintiff only contests the denial of his Kufi caps, claiming that Defendants denied his request to "wear approved head dress [sic] (Kufi) caps, where similar head dress [sic] was allowed by staff for Jewish Inmates."  (Am. to Compl. at 2.)

At the time Plaintiff was housed at GDDF, the jail had a policy that prohibited all headgear due to security concerns.  Recently, the jail has changed its policy and now permits "inmates demonstrating a sincere belief in religion where headwear is customary [to] have access to non-denominational headwear purchased by the ACSO."  (Ayala Decl. ¶ 28.)

## DISCUSSION

## I.   **Legal Standard for Summary Judgment**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Material facts are those which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  See id.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue

of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out that "there is an absence of evidence to support the nonmoving party's case."  Id.  If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted.  See Liberty Lobby, 477 U.S. at 249-50.  However, "self-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory."  Rodriguez, 265 F.3d at 902.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Liberty Lobby, 477 U.S. at 248.  If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law."  Celotex Corp., 477 U.S. at 323.  At summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  A court may not disregard direct evidence on the ground that no reasonable jury would believe it.  See id. (where nonmoving party's direct evidence raises genuine issues of fact but is called into question by other unsworn testimony, district court may not grant summary judgment to moving party on ground that direct evidence is unbelievable).  The district court may not resolve disputed issues of material fact by crediting one party's version of events and ignoring another.  Wall v. County of Orange, 364 F.3d 1107, 1111 (9th Cir. 2004) ("By deciding to rely on the defendants' statement of fact [in deciding a summary judgment motion], the district court became a jury.").

The nonmoving party has the burden of identifying with reasonable particularity the evidence

**United States District Court**
For the Northern District of California

1    that precludes summary judgment.  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996).  If the

2    nonmoving party fails to do so, the district court may properly grant summary judgment in favor of

3    the moving party.  See id.; see, e.g., Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026,

4    1028-29 (9th Cir. 2001) (even if there is evidence in the court file which creates a genuine issue of

5    material fact, a district court may grant summary judgment if the opposing papers do not include or

6    conveniently refer to that evidence).  Although the district court has discretion to consider materials

7    in the court file not referenced in the opposing papers, it need not do so.  Id. at 1029.  "The district

8    court need not examine the entire file for evidence establishing a genuine issue of fact."  Id. at 1031.

9        As mentioned above, a verified complaint may be used as an opposing affidavit under Rule

10   56(e), as long as it is based on personal knowledge and sets forth specific facts admissible in

11   evidence.  See Schroeder, 55 F.3d at 460 & nn.10-11.

12   **II.    Legal Claims**

13        **A.    Municipal and Supervisory Liability Claims**

14        Defendants argue that evidence does not exist to support Plaintiff's claims against Defendant

15   ACSO in its municipal capacity, or against Defendant Plummer in his supervisory capacity.  The

16   Court need not reach this issue.  Even if evidence existed to support Plaintiff's claims that

17   Defendants ACSO and Plummer could be liable as municipal and supervisory defendants,

18   respectively, the Court finds, as set forth below, that Defendants' actions did not cause a violation of

19   Plaintiff's right to religious freedom or equal protection of the laws.

20        **B.    Free Exercise Claim**

21        Plaintiff claims that Defendants violated his First Amendment right to religious freedom by

22   denying his request for an "Islamic Diet."  Plaintiff also claims that during Ramadan, Defendants

23   failed to deliver meals prior to sunrise, in accordance with the Muslim faith.  Additionally, Plaintiff

24   claims that Defendants denied access to religious services by failing to provide a spiritual leader or

25   chaplain for the Muslim weekly Friday services.  Further, Plaintiff alleges that Defendant Plummer

26   violated his rights by "fail[ing] to direct or to instruct his staff and subordinates concerning religious

27

28                                                    10

United States District Court
For the Northern District of California

1 practices."

2 **1.   Legal Standard**

3   In order to establish a violation of the First Amendment right to religious freedom, a prisoner

4 must show a defendant burdened the practice of his religion by preventing him from engaging in

5 conduct mandated by his faith, without any justification reasonably related to legitimate penological

6 interests.  See Freeman v. Arpaio, 125 F.3d 732, 736 (9th Cir. 1997).  To reach the level of a

7 constitutional violation, "the interference with one's practice of religion 'must be more than an

8 inconvenience; the burden must be substantial and an interference with a tenet or belief that is

9 central to religious doctrine."'  Id. at 737 (quoting Graham v. C.I.R., 822 F.2d 844, 851 (9th Cir.

10 1987)).  A prisoner may be inconvenienced in the practice of his or her faith so long as the

11 governmental conduct does not prohibit the prisoner from "participating in the mandates of his

12 religion."  See Freeman, 125 F.3d at 737.

13   A restriction on an inmate's First Amendment religious rights is valid if it is reasonably

14 related to legitimate penological interests.  See O'Lone v. Estate of Shabazz, 482 U.S. 342, 349

15 (1987) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).  The burden is on the prison officials to

16 prove that the restriction of the prisoner's exercise of religion was reasonably related to a legitimate

17 penological objective.  See Ashelman v. Wawrzaszek, 111 F.3d 674, 677-78 (9th Cir. 1997)

18 (applying test from O'Lone and Turner to determine reasonableness of decision denying Jewish

19 prisoner's request for an all-kosher diet).  In making such a determination, the court should consider

20 four factors:

21   First, there must be a valid, rational connection between the prison regulation and
   the legitimate governmental interest put forward to justify it, and the
22   governmental objective itself must be a legitimate and neutral one.  A second
   consideration is whether alternative means of exercising the right on which the
23   regulation impinges remains open to prison inmates.  A third consideration is the
   impact accommodation of the asserted right will have on guards, other inmates,
24   and the allocation of prison resources.  Finally, the absence of ready alternatives
   is evidence of the reasonableness of a prison regulation.

25 Allen v. Toombs, 827 F.2d 563, 567 (9th Cir. 1987) (citing Turner, 482 U.S. at 89-91).

26 **2.   Analysis**

27   **a.   Denial of "Islamic Diet"**

28

11

United States District Court
For the Northern District of California

The Court finds no merit in Plaintiff's claim that Defendants violated his First Amendment right to religious freedom by denying him an "Islamic Diet."  Defendants have presented uncontroverted evidence that the jail provides inmates with dietary alternatives to meet their religious needs.  Specifically, the jail's food provider, Aramark Corporation, provides an Ovo-Lacto Vegetarian alternative that meets the guidelines for both Kosher and Halal meals.  (Ayala Decl., Ex. 6.)  Plaintiff does not dispute this contention.  Further, the record reflects that Defendants accommodated Plaintiff's request for a diet that comports with the tenets of his religion by giving him a Lactose Intolerant tray.  (Id., Ex. 6.)  When Plaintiff complained about the "veggie diet," Defendants gave him the option of choosing a "regular tray" and suggested that he "avoid eating of the pork products."  (Id., Ex. 10.)  Defendants claim that "it would be impossible for Aramark to accommodate every inmate with a specific meal tray they desired."  (Id.)  The evidence presented sufficiently proves that Defendants attempted to accommodate Plaintiff's dietary needs in accordance with the tenets of his religion; therefore, Plaintiff cannot prove that he was unreasonably denied such meals.

Even viewing the evidence in a light most favorable to Plaintiff, the Court finds that he has failed to establish a "genuine issue for trial" concerning the violation of his First Amendment right to religious freedom based on the denial of Plaintiff's request for an "Islamic Diet."  Celotex, 477 U.S. at 324.  Thus, Defendants are entitled to summary judgment as matter of law in regards to this claim.

**b.**      **Interference with Plaintiff's Observance of Ramadan**

**(1)**      **Receiving Meals After "Stop Eating" Times**

Plaintiff alleges that Defendants violated his First Amendment right to religious freedom by failing to deliver his breakfast on three occasions before the "Stop Eating" times listed on the Ramadan Time Table for 2005.  Defendants agree that on these occasions, Plaintiff received his meals after the "Stop Eating" time that was publicly posted on the Ramadan Time Table for 2005.

United States District Court
For the Northern District of California

1   (Ayala Decl., Exs. 16, 18.)[4]  However, Defendants argue that on these days, breakfast was served

2   prior to sunrise and that Plaintiff had sufficient time to consume his meals in accordance with

3   Ramadan custom.  (MSJ at 14-15.)  Further, Plaintiff had alternative means of accessing food to

4   avoid violations of his fast.  (Id. at 15.)  According to Defendants, items from the commissary are

5   sold on a regular basis, and Plaintiff could have stored some extra food in the event that jail staff

6   failed to coordinate food delivery with its vendor.  (MSJ at 15.)  Additionally, Plaintiff could have

7   kept portions of his bag lunch (typically consumed during the day) that jail staff usually delivered

8   in the evenings.  (Id.)  Finally, Defendants argue that Plaintiff could have purchased food at the

9   GDDF's vending machines.  (Id.)

10          The Court finds Plaintiff's claim unavailing because the evidence in the record demonstrates

11  that Defendants' aforementioned actions do not rise to the level of a constitutional violation.  The

12  record sufficiently demonstrates that although Plaintiff received his meals after the "Stop Eating"

13  times, this alone did not prohibit him from participating in the mandates of his religion.  See

14  Freeman, 125 F.3d at 737.  Plaintiff received each meal *before* actual sunrise as indicated on the

15  Ramadan Time Table for 2005: on October 21, 2005, breakfast was served on 6:10 a.m. when

16  sunrise was at 7:22 a.m.; on October 31, 2005, breakfast was served on 5:30 a.m. when sunrise was

17  at 6:32 a.m.; and, on November 2, 2005, breakfast was served at 5:40 a.m. when sunrise was at 6:34

18  a.m. (Ayala Decl., Ex. 19.)  On each of these occasions, Plaintiff had approximately one hour from

19  the time he received his breakfast to the time of sunrise.  The Court finds that Plaintiff had

20  sufficient time to consume his meals in accordance with Ramadan custom.  Second, the available

21  alternatives, which Plaintiff does not dispute, also show that Defendants did not prohibit Plaintiff

22  from participating in the mandates of his religion by failing to deliver his breakfast before the "Stop

23  Eating" times on the three occasions mentioned above.

24

25          [4]  Defendants have acknowledged that Plaintiff filed grievances in which he claims that he
    received his meals after the "Stop Eating" time on two occasions -- October 21, 2005, and October
26  31, 2005 -- during the month of Ramadan.  (MSJ at 14-15.)  Attached to Plaintiff's Second
    Complaint is grievance No. 05G-G0132 in which he claims that on November 2, 2005 (the third
27  occasion), he received his breakfast after the "Stop Eating" time.  This grievance was "affirmed" on
    November 16, 2005 as indicated in the Inmate Grievance Response form because Plaintiff was "not
28  served breakfast in time for Ramadan."  (Second Compl., Ex. 1, Grievance No. 05G-G0132.)

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(2)    Concluding Ramadan Prematurely**

Plaintiff claims that Defendants failed to deliver his morning meals on November 3, 2005 and November 4, 2005 due to Sergeant Ary's memorandum that stated Ramadan ended prior to its official end date.  Defendants claim that the time-line listed in the Ramadan Time Table for 2005 is "patently inaccurate as it spans 31 days, which is longer in duration than a lunar month."  (MSJ at 16.)

The record shows that Defendants made a reasonable and legitimate effort to begin and to end Ramadan at the appropriate time for Oakland, California.  However, even assuming Ramadan ended on November 4, 2005 as stated in the Ramadan Time Table for 2005, the Court finds that a mistaken denial of two meals does not rise to the level of a constitutional violation.  See May v. Baldwin, 109 F.3d 557, 565-66 (9th Cir. 1997) (temporary denial of outdoor exercise and alleged denial of adequate food, water and sanitation did not rise to a constitutional violation); cf. Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006) (holding that a prison official violates free exercise rights if he intentionally and without justification denies an inmate his religiously mandated diet).  Plaintiff was provided meals for fasting throughout the entire month of Ramadan with the exception of November 3 and 4, 2005.  A temporary denial of meals does not, however, amount to governmental conduct that prohibits Plaintiff from "participating in the mandates of his religion."  Cf. Freeman, 125 F.3d at 737 (finding that shackling, requiring sign-in for services, abusive language directed at faith and failure to give notice allowing time for cleansing ritual did not prevent the inmate from participating in the mandates of his religion).  As explained above, on both days, Plaintiff could have accessed food through other means; however, he has failed to present any evidence refuting this contention.

**(3)    Denial of Special Meal for Eid**

Plaintiff alleges that Defendants' denial of his request for a special meal to celebrate Eid at the end of Ramadan violated his First Amendment right to religious freedom.  Defendants argue that the jail "does not have a duty to supply inmates with feasts, or other luxuries, to enable celebration of important religious observations."  (MSJ at 15.)  In response to Plaintiff's grievance

14

on this issue, the Inmate Grievance Response dated November 23, 2005, states that celebrating the end of Ramadan could be accomplished by prayer alone, and that a special meal and the sharing of gifts were not necessary.  (Second Compl., Ex. 1.)  It further states that because of security and facility restraints, jail staff "has never made special arrangements for the provisions of a special feast or allowing the exchange of gifts between inmates."  (Id.)  The Court finds that Plaintiff has failed to provide evidence that a special meal is a mandate of his religion in order to celebrate Eid that cannot be accomplished through other means.

However, assuming that the special meal for Eid is a mandate of Plaintiff's religion, the Court finds that Defendants' refusal to provide Plaintiff with the special meal for Eid is not a violation of his First Amendment right to religious freedom based on the Turner factors as outlined below.  482 U.S. at 89-90.

The first Turner factor requires the Court to consider whether there is a logical connection between the failure to provide the special meal for Eid and the legitimate governmental interest that justifies it.  Id.  Plaintiff was denied the special meal for Eid due to security and facility restraints.  The Court finds that Defendants' decision not to provide the special meal for Eid to Plaintiff is reasonably related to a legitimate penological objective, i.e., budgetary and security concerns; therefore, the first factor weighs in favor of Defendants.

The second Turner factor requires the Court to consider whether Plaintiff has alternative means by which he can practice his religion.  482 U.S. at 90.  While Plaintiff demands to be provided the special meal for Eid, he has failed to show that celebrating the end of Ramadan could not have been accomplished either through prayer or by consuming his regular dinner tray.  Cf. Ward v. Walsh, 1 F.3d 873, 878 (9th Cir. 1993), cert. denied, 510 U.S. 1192 (1994) (distinguishing between "a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his soul.").  Thus, the second factor weighs in favor of Defendants.

The third Turner factor requires the Court to determine the impact the accommodation will have on prison officials, prison resources and other inmates.  482 U.S. at 90.  As discussed above, providing Muslim inmates with the special meal for Eid may cause resentment amongst inmates of

United States District Court
For the Northern District of California

1    other faiths who do not receive the same treatment.  See DeHart v. Horn, 227 F.3d 47, 53 (3d Cir.

2    2000) (en banc) (finding that preventing inmate jealously was a legitimate penological concern).

3    Therefore, the third factor also weighs in favor of Defendants.

4           Finally, under the fourth Turner factor, the Court must consider whether there are ready

5    alternatives to the prison's current policy that would accommodate Plaintiff at a de minimis cost to

6    the prison.  482 U.S. at 90.  As stated above, Defendants' denial of the special meal for Eid and

7    refusal to make special arrangements for the provisions of such a special meal are reasonably

8    related to budgetary constraints and security concerns.  Thus, the final factor weighs in favor of

9    Defendants as well.

10          In sum, even viewing the evidence in the light most favorable to Plaintiff, the Court finds

11   that he has failed to establish a "genuine issue for trial" concerning the violation of his First

12   Amendment right to religious freedom based on Defendants' aforementioned actions that allegedly

13   interfered with his observance of Ramadan.  Celotex, 477 U.S. at 324.  Thus, Defendants are

14   entitled to summary judgment as matter of law in regards to this claim.

### c.   Failure to Provide Imam

16          Plaintiff states that he "requested counseling by a spiritual leader or chaplain, which was not

17   available because the Alameda [County] Sheriff['s] department has failed to contact religious

18   leaders to participate in Islamic services, for the Muslims weekly Friday Islamic service."  (Am. to

19   Compl. at 5.)

20          The record shows that Defendants did not necessarily deny Plaintiff an Imam, but rather,

21   their failure to provide one was due to the practical hardships in locating an Imam willing to

22   provide services at GDDF.  In fact, the Inmate Grievance Response dated July 15, 2005, states that

23   it was "almost impossible to attain an Imam who is willing to perform Muslim services at the jail."

24   (Ayala Decl., Ex. 14.)  The grievance further states that "if [Plaintiff] know[s] of any certified

25   Imams that is [sic] willing to become a volunteer for the incarcerated inmates, please have them

26   contact Inmate Services."  (Id.)  Further, although Defendants could not provide an Imam, Plaintiff

27   was nonetheless provided a chaplain to meet his spiritual needs.  One of the primary roles of the

28   GDDF's Chaplain is to prepare and deliver religious services.  (Jennings Decl., ¶ 6.)  Chaplain

**United States District Court**
For the Northern District of California

1   Jennings "provide[s] liaison with various denominations as necessary, and supervise religious

2   volunteers in providing services and counseling as needed." (Id.)  The record shows that Plaintiff

3   has utilized this service, and has participated in non-denominational religious services on a weekly

4   basis with the jail's religious volunteer staff.  (Ayala Decl., Ex. 13.)  Thus, Defendants' failure to

5   provide an Imam did not deny Plaintiff all means of religious expression.

6           The Court finds that, even viewing the evidence in the light most favorable to Plaintiff, he

7   has failed to establish a "genuine issue for trial" concerning the violation of his First Amendment

8   right to religious freedom based on the aforementioned actions of Defendants that allegedly

9   interfered with Plaintiff's observance of Ramadan.  Celotex, 477 U.S. at 324.  Therefore,

10  Defendants are entitled to summary judgment as a matter of law in regards to this claim.

11                          **d.      Denial of Kufi Cap**

12          Plaintiff alleges that Defendants' denial of his request for a Kufi cap violated his First

13  Amendment right to religious freedom.[5]  Defendants argue that there are "penological interests

14  served by the prohibition of religious headwear." (MSJ at 14.)  Specifically, Defendants state that

15  "[t]here is a need for uniformity in the prison context, and exceptions to this rule often lead to

16  conflicts." (Id.)  Additionally, "clothing at GDDF consists of uniforms, and creating an exception

17  to this rule in the form of permitting religious headgear creates the opportunity for inmates to

18  conceal contraband, which heightens the risk of other problems at GDDF." (Id.)

19          Plaintiff has not provided any admissible evidence that Kufi caps are mandated by his

20  religion.  However, assuming Kufi caps are a religious requirement, in order to determine whether

21  the denial of a Kufi cap amounted to a constitutional violation, the Court must evaluate Plaintiff's

22  claim under the Turner factors.

23          Under the first Turner factor, the Court must determine whether there is a rational

24  connection between the prison regulation denying Plaintiff a Kufi cap and the legitimate

25  governmental interest put forward to justify it.  482 U.S. at 89.  The Fifth Circuit upheld a prison

26

27          [5]  While the record shows that the jail has since changed the policy on religious headgear and
28  now allows inmates to have access to non-denomination headwear provided by the jail staff, such a
    change does not affect the Court's analysis as to this claim.

1  regulation that restricted an inmate from wearing Kufi caps based on testimony that weapons could

2  be concealed under them and that inmates could use Kufi caps to "show their colors." Muhammad

3  v. Lynaugh, 966 F.2d 901, 903 (5th Cir. 1992).  Meanwhile, another federal court found that

4  restricting an inmate from possessing Kufi caps was justifiable because head coverings were often

5  used to "identify participation in a specific racial and/or political group, which furthers gang

6  activity and difficulties between such groups." Sutton v. Stewart, 22 F. Supp. 2d 1097, 1102 (D.

7  Ariz. 1998) (internal quotations omitted).  In both cases, the evidence supported a finding of a

8  legitimate penological interest in restricting an inmate's possession of Kufi caps.

9         Finally, courts have rejected a causal requirement -- that the specific contraband pose a

10 security threat -- because it would impede "the ability of corrections officials to anticipate security

11 problems and to adopt innovative solutions." O'Lone, 482 U.S. at 349 (internal quotations and

12 citation omitted); see also Frost v. Symington, 197 F.3d 348, 355 (9th Cir. 1999) (upholding a

13 district court's decision to grant summary judgment in favor of prison officials who withheld

14 inmate's pornographic material stating that "even in the absence of institution-specific or general

15 social science evidence, as long as it is plausible that prison officials believed the policy would

16 further a legitimate objective, the governmental defendant should prevail [under] Turner's first

17 prong").  The same security reasons for denying Plaintiff's Kufi cap apply here.  Because a causal

18 connection is unnecessary, it is inapposite that a Kufi cap, by itself, is not dangerous contraband.

19 Thus, the first factor weighs in favor of Defendants.

20        The second Turner factor requires the Court to examine whether there are alternative means

21 of religious expression.  482 U.S. at 89.  However, the "relevant inquiry under this factor is not

22 whether the inmate has an alternative means of engaging in the particular religious practice that he

23 or she claims is being affected; rather, we are to determine whether the inmates have been denied

24 all means of religious expression." Ward, 1 F.3d at 877; see also Johnson v. Moore, 948 F.2d 517,

25 520 (9th Cir. 1991) (no free exercise violation despite prisoner being denied a Unitarian

26 Universalist chaplain since prisoner had other reasonable opportunities to practice his religion).

27 Nothing in the record shows that Plaintiff was prevented from practicing his religious beliefs by

28

using other religious items that jail staff provided, i.e. a Quran and a prayer rug.  Thus, even if Defendants denied Plaintiff's request for a Kufi cap, the Court finds that Plaintiff was not denied all means of religious expression.  Thus, the second factor weighs in favor of Defendants.

The third <u>Turner</u> factor requires the Court to consider the impact accommodating Plaintiff would have on prison officials, other inmates and allocation of prison resources.  482 U.S. at 90.  Initially, during the time period Plaintiff was housed at GDDF, Defendants prohibited all inmates from wearing religious headgear.  Defendants argue that there was a need for uniformity because any exceptions to the general prohibition of headgear would create "the opportunity to conceal contraband, which heightens the risk of other problems at GDDF."  (MSJ at 14.)  Allowing Plaintiff to have a Kufi cap would heighten the risk of tension and violence among other inmates who were denied religious headgear.  Additionally, Kufi caps can also be used to hide weapons and other dangerous contraband.  Further, should the prison accommodate Plaintiff, then inmates of other faiths likely would demand the same treatment, leading to an influx of requests and added burden on prison officials.  <u>Cf.</u> <u>Henderson v. Terhune</u>, 379 F.3d 709, 714 (9th Cir. 2004) (recognizing the burden that would be placed on the prison should it allow an exception for an inmate whose religion banned cutting hair).  Thus, the third factor weighs in favor of Defendants as well.

Finally, the final <u>Turner</u> factor requires the Court to examine alternatives that could be provided at a <u>de minimis</u> cost.  482 U.S. at 90.  There are no ready alternatives to the regulation prohibiting religious headwear for all inmates.  The absence of such ready alternatives is evidence of the reasonableness of the regulation.  <u>Id.</u>  As stated in the third factor above, allowing Plaintiff to possess and use a Kufi cap may cause inmate unrest as well as security issues that must be addressed by the prison.  Thus, the final factor weighs in favor of Defendants.

The Court finds that, even viewing the evidence in the light most favorable to Plaintiff, he has failed to establish a "genuine issue for trial" concerning the violation of his First Amendment right to religious freedom based on the denial of a Kufi cap.  <u>Celotex</u>, 477 U.S. at 324.  Therefore, Defendants are entitled to summary judgment as a matter of law in regards to this claim.

C.      **Equal Protection**

Plaintiff claims that his rights under the Equal Protection Clause were violated when he was "denied authorization to wear his's [sic] religious head gear, despite the fact other religious groups were approved to wear head gear."  (Am. to Compl. at 2.)  Defendants respond that "during the time relevant to Plaintiff's claims, the ACSO policy was to prohibit all religious headgear due to security concerns [and that] Jewish inmates were prohibited from wearing yarmulkes, just as Islamic inmates were prohibited from wearing kufi prayer caps."  (MSJ at 7-8.)

1.      **Legal Standard**

The Equal Protection Clause ensures that prison officials cannot discriminate against particular religions.  Freeman, 125 F.3d at 737.  Plaintiff has the burden to show that officials intentionally acted in a discriminatory manner to support a § 1983 claim.  FDIC v. Henderson, 940 F.2d 465, 471 (9th Cir. 1991); Sascha-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1112 (9th Cir. 1991) (stating that discriminatory intent can sometimes be inferred by the mere fact of different treatment).  The Ninth Circuit in Sascha-Nownejad stated:

> The evidence may be either direct or circumstantial, and the amount that must be produced in order to create a prima facie case is "very little."  Normally, when such evidence has been introduced, a court should not grant summary judgment to the defendant on any ground relating to the merits.  Even if the defendant articulates a legitimate, nondiscriminatory reason for the challenged . . . decision, thus shifting the burden to the plaintiff to prove that the articulated reason is pretextual, summary judgment is normally inappropriate.  When a plaintiff has established a prima facie inference of disparate treatment through direct or circumstantial evidence of discriminatory intent, he will necessarily have raised a genuine issue of material fact with respect to the legitimacy or bona fides of the [defendant's] articulated reason for its . . . decision.  Specifically, in evaluating whether the defendant's articulated reason is pretextual, the trier of fact must, at a minimum, consider the same evidence that the plaintiff introduced to establish her prima facie case.

934 F.2d at 1110 (internal quotation marks and citations omitted).

2.      **Analysis**

The Court finds that Plaintiff has not established a prima facie case of discrimination against his religion based on the denial of his request for a Kufi cap.  In fact, Plaintiff has not presented any

**United States District Court**
For the Northern District of California

direct or indirect evidence to support his equal protection claim against Defendants. Rather, he makes a conclusory allegation that Defendants denied him a Kufi cap while allegedly allowing inmates of other religious faiths to wear religious headgear.

While Plaintiff presented a cognizable claim for a violation of equal protection based on an allegation that Defendants discriminated against his religion by denying him a Kufi cap, that allegation alone will not survive a motion for summary judgment. Plaintiff's claim is entirely conclusory and he has come forward with nothing to even suggest that the denial was based on his religion. His conclusory allegations and mere assertions of discrimination against his religion are insufficient to overcome a motion for summary judgment. Fed. R. Civ. P. 56; see Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); see also Preston v. Heckler, 734 F.2d 1359, 1373 (9th Cir. 1984); Keniston v. Roberts, 717 F.2d 1295, 1300 (9th Cir. 1983).

Moreover, Defendants presented evidence showing that GDDF did not have a policy or custom of permitting Jewish inmates to wear yarmulkes while prohibiting Muslim inmates from wearing Kufi prayer caps. ACSO Policy & Procedure 18.07 provides that "[a]ll religions will be accorded equal status and protection. Provisions will be made for inmates access to appropriate facilities, clergy or spiritual advisors, publications and religious symbols, and other requirements of various faiths, subject only to the limitations necessary to maintain order and security." (Ayala Decl., Ex. 4.) At the time Plaintiff was housed at GDDF, it was the policy and practice to prohibit all inmates from wearing denominational headgear. Indeed, the Inmate Grievance Response dated July 15, 2005, informed him that "due to security concerns, inmates are not given . . . headgear." (Id., Ex. 14.)

Plaintiff has not produced any evidence indicating that Defendants harbored a discriminatory intent in denying him a Kufi cap. Accordingly, the Court finds that Defendants have shown that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence" to support Plaintiff's claim of an equal protection violation. Celotex, 477 U.S. at 325. Therefore, Defendants are entitled to summary judgment on this claim.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (docket no. 57) is GRANTED. In addition to the grounds set out above for granting summary judgment, Plaintiff's request for declaratory relief is moot. See Native Village of Noatak v. Blatchford, 38 F.3d 1505, 1509 (9th Cir. 1994) (declaratory judgment action may not be used to secure judicial determination of moot questions).

Judgment will be entered in Defendants' favor and against Plaintiff. The Clerk of the Court shall terminate all pending motions and close the file.

This Order terminates Docket no. 57.

IT IS SO ORDERED.

DATED: March 31, 2010

SAUNDRA BROWN ARMSTRONG
United States District Judge

1

2  UNITED STATES DISTRICT COURT

3  FOR THE

4  NORTHERN DISTRICT OF CALIFORNIA

5

6

7  NAPOLEON SANDEFORD,                         Case Number: CV06-06794 SBA

8            Plaintiff,                        **CERTIFICATE OF SERVICE**

9      v.

10 CHARLES PLUMMER et al,

11           Defendant.

12 _____/

13

14 I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

15 That on April 9, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said
16 copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
17 located in the Clerk's office.

18

19

20 Napoleon Sandeford 97606-011
   Federal Detention Center
21 5675 8th Street
   Camp Parks
22 Dublin, CA 94568

23 Dated: April 9, 2010

24                                             Richard W. Wieking, Clerk
                                               By: LISA R CLARK, Deputy Clerk
25

26

27

28

P:\PRO-SE\SBA\CR.06\Sandeford6794.grantMSJ.wpd                    23